# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8064 | **DATE** | 8/20/2004 |
| **CASE TITLE** | Continental Casualty Co. vs. Steelcase Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■  [Other docket entry]  ENTER MEMORANDUM OPINION AND ORDER:  the Court denies Steelcase's motion for summary judgment on Count I and grants Steelcase's motion on Count II. STATUS HEARING SET FOR  9/7/04 AT 10:00A.M.

(11) ■  [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | AUG 2 3 2004 | | |
| | Notified counsel by telephone. | | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | | 29 |
| | Mail AO 450 form. | | U.S. DISTRICT COURT | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| TBK | courtroom deputy's initials | 2004 AUG 20 PM 5: 19 | Date/time received in central Clerk's Office | date mailed notice | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CONTINENTAL CASUALTY COMPANY,     )
                                        )
            Plaintiff,        )
     v.                          )     No. 02 C 8064
                                          )
                                        )     Judge Mark R. Filip
STEELCASE INC.,                 )
                                        )     Magistrate Judge Ashman
            Defendant.     )

**MEMORANDUM OPINION AND ORDER**

On September 27, 2002, Plaintiff Continental Casualty Company ("Plaintiff" or "CCC")

filed a four-count suit in Illinois state court against Defendant Steelcase Inc. ("Defendant" or

"Steelcase"). On November 7, 2002, Steelcase removed the case to federal court on the basis of

diversity of citizenship. (D.E. 1, Notice of Removal.) Steelcase subsequently filed an unopposed

motion to dismiss Counts III and IV of CCC's complaint, which Judge Shadur granted. (D.E. 7,

8.) CCC's two surviving claims are breach of contract (Count I) and promissory estoppel (Count

II). Before the Court is Steelcase's motion for summary judgment on CCC's remaining two

claims. For the reasons set forth below, Steelcase's motion is granted in part and denied in part.

**I.    FACTS**[1]

_____

[1] The Court takes the relevant facts from the parties' Local Rule ("L.R.") 56.1 statements
and exhibits. The Court resolves factual ambiguities in favor of Plaintiff, the non-movant. _See
Foley v. City of Lafayette_, 359 F.3d 925, 928 (7th Cir. 2004). Plaintiff, as part of its response to
Defendant's motion for summary judgment, submitted a document entitled "[CCC's] Objection
to Certain of Steelcase's LR56.1(a)(3) Statement of Undisputed Material Facts." (D.E. 17.) As
best the Court can tell, this document purports to respond to Defendant's L.R. 56.1(a)(3)
statement of material facts. L.R. 56.1(b)(3)(A) provides in part that the party opposing a motion
for summary judgment shall "respon[d] to each numbered paragraph in the moving party's [L.R.
56.1(a)(3)] statement. . . ." Plaintiff's purported response does not address (by admitting or

The facts are relatively straightforward. Steelcase, a Michigan corporation, manufactures and supplies office furniture, as well as architectural and other workplace environment products. (Defendant's L.R. 56.1(a)(3) Statement of Undisputed Material Facts ("Def. SF") ¶¶ 1, 3.) Steelcase sells products to customers (like CCC) through its dealers, such as Office Concepts, Inc. ("OCI"). (*Id.* ¶¶ 2, 8.)

On April 11, 1990, Steelcase, OCI, and CCC, an Illinois corporation, executed an eighteen-page agreement (the "1990 Agreement"). (*Id.* ¶ 4.) Under the terms of the 1990 Agreement, Steelcase would become CCC's "sole source" furniture provider, and CCC would purchase "substantially all of its new office furniture requirements" from Steelcase over the course of the contract period. (*Id.* ¶ 6.) The 1990 Agreement also provided that CCC would make its required Steelcase purchases through OCI. (*Id.* ¶ 8.) The parties then carried on business in accordance with the terms of the 1990 Agreement.

In late 1996 or early 1997, Steelcase and CCC began discussing the impending expiration of the 1990 Agreement term and initiated preliminary negotiations for a new five-year purchasing agreement to succeed the 1990 Agreement. (*Id.* ¶ 10.) On July 17, 1997, Steelcase submitted a written proposal to CCC regarding the follow-on purchasing agreement. (*Id.* ¶ 11.) This proposal contained a discount structure with a maximum discount of 57% for furniture purchases. (*Id.* ¶ 12.)

---

denying) each paragraph in Defendant's L.R. 56.1(a)(3) statement. Instead, Plaintiff responds (by making various objections) only to paragraphs 31, 35, 38, 42, 46, and 48 of Defendant's statement. As Plaintiff did not deny the remaining paragraphs of Defendant's statement, the factual allegations in these paragraphs are deemed admitted (to the extent they properly are supported by admissible record evidence). Where appropriate, the Court will address Plaintiff's aforementioned objections in the body of this Opinion.

CCC, however, was dissatisfied with Steelcase's proposed discount. (*Id.* ¶ 13.) Accordingly, in August 1997, CCC initiated a competitive bidding process with three of Steelcase's competitors, soliciting proposals for terms on a new five-year contract to follow its 1990 Agreement with Steelcase. (*Id.* ¶ 14.) Learning of CCC's solicitation of bids from other vendors, on September 29, 1997, Steelcase and OCI submitted a new proposal to CCC. (*Id.* ¶¶ 15, 17.) The proposal contained a maximum discount of 64.82% for furniture purchases. (*Id.* ¶ 18.)

From October through December 1997, CCC continued discussions with Steelcase and the other competitors. (*Id.* ¶ 21.) On December 23, 1997, however, CCC sent a letter to OCI and Steelcase in which CCC requested that Steelcase apply the 64.82% discount to all of CCC's purchases falling between May 1, 1997 and December 31, 1997. (*Id.* ¶¶ 22-23.)

On January 2, 1998, Steelcase (through OCI) countered with a proposal outlining a number of additional terms for the parties' purchasing relationship. (*Id.* ¶ 24.) In this latest proposal, Steelcase offered a more limited retroactive discounting adjustment than that requested by CCC in its letter. (*Id.* ¶ 25.) Specifically, Steelcase proposed to make the 64.82% retroactive pricing adjustment applicable to orders CCC placed with Steelcase after September 29, 1997, rather than May 1, 1997. (*Id.* ¶ 27.) Moreover, the retroactive pricing was expressly contingent on CCC's execution by January 16, 1998 of a letter of intent naming Steelcase and OCI as CCC's sole source furniture provider. (*Id.*) CCC, however, never indicated acceptance of the January 2, 1998 proposal and did not sign a letter of intent by Steelcase's deadline, although CCC continued to request a more extensive retroactive discount from Steelcase. (*Id.* ¶¶ 28-29.)

During the last week of January 1998, at a meeting in CCC's offices, Steelcase offered

3

CCC several new incentives. (*Id.* ¶ 30.) Among other things, Steelcase agreed to extend a retroactive price adjustment based on furniture that CCC had already purchased in the period from May 1, 1997 to December 31, 1997. (*Id.* ¶ 31.) The potential cash value of the price adjustment was roughly $1.5 million. (*Id.*) Of central significance, Steelcase offered to pay the $1.5 million price adjustment (the "$1.5 million refund") "upon execution" of a new agreement naming Steelcase and OCI as CCC's single-source furniture providers. (*Id.* ¶ 32.)

On January 29, 1998, Joan McDonald ("McDonald"), a Steelcase market manager, sent a letter (the "Offer Letter") to CCC's Kurt Redig ("Redig") confirming the $1.5 million refund offer and the other incentives that Steelcase had offered. (*Id.* ¶ 33.) The Offer Letter in substantial part reads:

> Dear Kurt,
>
> Thank you for the opportunity to meet with you on Wednesday. Following is a summary of the points we discussed and the offer associated with each point.
>
> ● PRICE HOLD
>
> ***
>
> ● UNION INSTALLATION
>
> ***
>
> ● RETROACTIVE PRICING
>
> The new discount will apply to all Steelcase product orders only, not including SDP companies, received May 1, 1997 through December 31, 1997. This retroactive price adjustment of $ 1,500,000.00 will be in the form of a one-time refund to be paid *upon execution* of the CNA/OCI/STC agreement naming Steelcase and [OCI] as sole source provider.
>
> ● NASHVILLE

To help [CCC] replace the 1,024 Context workstations in Nashville, at our meeting yesterday, we proposed buying them for 8% of list. . . . [W]e have determined a credit amount (for the Context workstations) of $894,226.64. . . . This buyback is contingent on the purchase of a minimum of 1600 new Series 9000 workstations for Nashville, and would take the form of a credit against the invoice.

\*\*\*\*

Sincerely,

Joan D. McDonald

(Steelcase Ex. BB.) (emphasis added). It is undisputed that the Offer Letter represents Steelcase's only written offer to pay the $1.5 million refund to CCC. (Def. SF ¶¶ 64-65.)

On March 13, 1998, CCC verbally informed Steelcase that it had selected Steelcase as its furniture provider for the new five-year term. (Def. SF ¶ 50.) At some point in early April 1998 (the exact date is unclear), CCC then requested that Steelcase extend the proposed maximum discount of 64.82% in advance of a finalized, signed contract. (*Id.* ¶ 54.) At the same time, CCC assured Steelcase and OCI that it would finalize and sign the proposed agreement soon. (*Id.* ¶ 55.)

On April 9, 1998, in reliance on CCC's assurances that it would sign the contract soon, and in response to CCC's request, Steelcase and OCI agreed to provide the 64.82% discount retroactively to purchases CCC made after March 13, 1998 and going forward. (*Id.* ¶ 56.) On April 13, 1998, McDonald sent to CCC's Deborah Reid-Neal ("Read-Neal") a written draft agreement for review (the "April 1998 Draft"). (*Id.* ¶ 52.) The April 1998 draft did not contain any reference to the $1.5 million refund. (*Id.* ¶ 53.)

Shortly after receiving the April 1998 draft, CCC began requesting changes to the draft's proposed terms. (*Id.* ¶ 61.) These requests for changes and edits persisted over time. For

example, in or around August 1998, CCC requested that the words "sole source" be stricken from the draft contract, and Steelcase complied with the request. (*Id.* ¶ 69.) Even after the words "sole source" were removed, however, the draft agreements still contained language stating that it was CCC's intent to "purchase its new office furniture requirements from [Steelcase] through [Steelcase's dealers]. Buyer's annual purchase volume is estimated by Buyer to be $40,000,000 List." (*Id.* ¶ 70; Def. SF Ex. RR at ST-CCC 00670.)

It is undisputed that during 1998 and 1999, Steelcase repeatedly requested that CCC finalize and sign a new agreement. (*Id.* ¶ 71.) It is also undisputed that during 1998 and 1999, Steelcase repeatedly told CCC that it would not receive the $1.5 million rebate until a new agreement was signed. (*Id.* ¶ 72.) It is further undisputed that both Steelcase and OCI believed that a signed agreement would provide significant value and security to them for various reasons—such as the fact that such an agreement would indicate CCC's firm, five-year commitment to continue purchasing its office furniture requirements from Steelcase through OCI. (*Id.* ¶ 74.) Furthermore, Hal Ronin, CCC's Group Vice President of Corporate Services from 1998 through late 1999, acknowledged that Steelcase would gain economic and other benefits from having a signed agreement—including, for example, the benefit that a signed contract "'provided a level of documented commitment on [CCC's] part,'" and would have "'helped spell out some of the other understandings and agreements between the two corporations for non-product and pricing agreements such as the year 2000 clauses and indemnifications from an insurance standpoint and those types of things.'" (*Id.* ¶ 77 (quoting Ronin deposition, Def. SF Ex. E at 122).)

Until at least February 1999,[2] the parties continued negotiations and exchanged many drafts of the written contract, which Steelcase continually altered in response to CCC's requested changes. (*Id.* ¶ 62.) For example, Steelcase acquiesced to CCC's request that the draft agreement be changed from a three-party contract (between CCC, Steelcase, and OCI) to a two-party agreement (dropping OCI). (*Id.*) In addition, Steelcase agreed to several other CCC proposals, such as changing the agreement's definition of which CCC affiliates would be bound by the agreement's terms. (*Id.*)

Even as the parties labored over the terms contained in various drafts during 1998 and 1999, it is undisputed that the parties transacted business. For instance, it is undisputed that CCC bought some furniture, and that Steelcase provided CCC the Nashville credit discussed in the Offer Letter. (Plaintiff's L.R. 56.1(b)(3)(B) Statement of Additional Facts ("Pl. SAF") ¶ 11.) Also, from at least March 1998, Steelcase allowed CCC to purchase furniture from Price List 148 in accordance with the Offer Letter's price hold provision. (*Id.* ¶ 10; Defendant's Response ("Def. Resp.") ¶ 10.) CCC's volume of purchases during this period, however, dropped "far below" the estimates contained in the parties' various draft agreements.[3] (Def. SF ¶ 68.) For

---

[2] In or around February 1999, Steelcase sent a revised draft purchasing agreement to CCC; this draft (the "1999 Draft Agreement") was the final draft purchasing agreement that Steelcase ever submitted to CCC. (Def. SF ¶¶ 78-80; Def. Ex. RR.) It is undisputed that the 1999 Draft Agreement does not incorporate any Steelcase offer of a $1.5 million refund, nor is the Offer Letter attached or incorporated into the 1999 Draft Agreement. (Def. SF ¶ 81; Def. Ex. RR.)

[3] The 1999 Draft Agreement provides in relevant part that

It is [CCC]'s intent to utilize [Steelcase] as an "integrated supplier[,]" which shall include the continued development of national furniture standards for [CCC]'s facilities based on [Steelcase]'s products. To that purpose, it is [CCC]'s intention to purchase its new office furniture requirements from [Steelcase] through

example, CCC estimated its yearly furniture purchases to total $40 million, but CCC purchased some $20-25 million of Steelcase furniture through OCI in 1998 and only $11-12 million in 1999. (Pl. SAF ¶¶ 46-47; Def. Resp. ¶¶ 46-47; Def. SF ¶ 68.) It is also undisputed that CCC continued to purchase furniture from manufacturers other than Steelcase. (Def. SF ¶ 68.)

During the remainder of 1999, the parties' continued negotiations toward a written agreement failed to bear fruit, apparently because of CCC's continued disagreements with wording in the contract drafts. For example, on or about May 20, 1999, McDonald and several OCI representatives met with CCC's Margie Steck ("Steck") and asked that CCC sign an agreement. (*Id.* ¶ 82.) Steck, however, informed McDonald and the others that she had "unresolved issues" with the current draft, but she refused to offer specifics at that time. (*Id.* ¶ 83.) In June 1999, Steelcase's vice president and general sales manager called Steck to request that CCC sign an agreement; Steck responded that CCC would sign an agreement "shortly." (*Id.* ¶¶ 84-85.)

Throughout the entire period since the Offer Letter, CCC never demanded or even requested payment of the $1.5 million refund. (*Id.* ¶ 59.) Also, it is undisputed that there is no evidence that, before Steelcase withdrew its offer in February 2000, anyone from CCC ever communicated to Steelcase that it was entitled to the $1.5 million in the absence of a signed contract, or that Steelcase or OCI understood the word "execution" not to mean "signature." (*Id.* ¶ 60.)

---

[Participating Steelcase Dealers]. [CCC]'s annual purchase volume is estimated by [CCC] to be $40,000,000 List.

(Def. Ex. RR at ST-CCC 00670.)

By February 2000, the parties still had not agreed to or signed any particular draft agreement. (*Id.* ¶ 87.) Furthermore, it is undisputed that Steelcase never gave CCC a deadline to sign an agreement in the two-year period following the Offer Letter (Pl. SAF ¶ 34), and that CCC never requested payment of the $1.5 million refund. (Def. SF ¶ 59.)

On February 15, 2000, almost two full years following Steelcase's Offer Letter and CCC's verbal notification that it had selected Steelcase, representatives from Steelcase and OCI met with Steck. (Def. SF ¶ 88.) At the meeting, Steelcase informed CCC that it was withdrawing its $1.5 million refund offer due to CCC's failure to sign an agreement. (*Id.* ¶ 89.)

In the wake of the meeting, CCC ultimately stopped purchasing office equipment from Steelcase (*id.* ¶ 90) and subsequently filed a four-count suit in Illinois state court. In the interim, the case was removed to federal court, and at present only two counts from CCC's original complaint remain. First, CCC claims that Steelcase breached an "Interim Agreement" to pay CCC the $1.5 million refund, which represented a discount from the purchase price CCC paid for Steelcase furniture between May 1, 1997 and December 31, 1997. (D.E. 1, Compl. ¶ 26.) Second, CCC claims that it has been damaged by detrimental reliance on Steelcase's promise to pay the $1.5 million refund, and therefore it is entitled to recover under a promissory estoppel theory. (*Id.* ¶ 25.) Steelcase seeks summary judgment on both remaining counts.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial when a reasonable

9

jury could return a verdict for the party opposing summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

## III.  DISCUSSION

Steelcase argues that summary judgment is appropriate because (1) Steelcase's offer to pay the $1.5 million refund was contingent upon CCC's "execution" (signing) of new agreement, and thus was a condition precedent that CCC never satisfied; and (2) CCC's promissory estoppel claim necessarily fails because CCC could not reasonably rely on any alleged promise by Steelcase when the obligation was subject to a condition precedent. (Def. Mem. at 5, 13.) In response, CCC argues that summary judgment is inappropriate because (1) whether the parties intended to make payment of the $1.5 million refund contingent on CCC signing a contract is factually uncertain; (2) CCC's signing of a contract was not a condition precedent to payment; (3) even if there was a condition precedent, Steelcase waived it; and (4) Steelcase "did not allow" CCC to sign the contract. (Pl. Mem. at 4, 5, 8, and 10.) CCC did not brief the promissory estoppel issue or otherwise respond to Steelcase's arguments in support of its motion for summary judgment on Count II.

Before turning to the substance of the parties' arguments, the Court notes several important distinctions between the factual allegations originally serving as the basis for CCC's

10

claims and the facts presented in the parties' summary judgment papers. In its complaint, CCC based its breach claim on Steelcase's alleged breach of an "interim agreement" to pay CCC the $1.5 million refund. (D.E. 1, Compl. ¶ 26.) CCC alleged that the parties reached this interim agreement in April 1997, the terms of which allowed CCC to purchase Steelcase furniture at a 64.82% discount from May 1, 1997 through December 31, 1997, pending finalization of a new agreement between the parties. (*Id.* ¶¶ 7-8.) CCC also alleged that under the interim agreement, it paid Steelcase the non-discounted price for the furniture, and Steelcase apparently was to refund the discount (totaling $1.5 million) back to CCC at some later point. (*Id.* ¶¶ 9-10.) CCC averred that Steelcase subsequently refused to pay the $1.5 million refund, thereby breaching the interim agreement. (*Id.* ¶¶ 25-26.) In its promissory estoppel claim, CCC argues that it detrimentally relied on Steelcase's promise to pay the refund by foregoing opportunities to purchase furniture at lower prices from other vendors. (*Id.* ¶ 17.) In the process, CCC alleges it suffered $1.5 million in damages on "office furniture and/or equipment purchased by CCC during the time period of May 1, 1997 through December 31, 1997." (*Id.* ¶ 21; *see also id.* ¶ 18.)

At the summary judgment stage, CCC changed its position, no doubt in response to facts unhelpful to it that were established in discovery. As indicated above in the facts section, Steelcase actually offered the $1.5 million refund in January 1998 (Def. SF ¶ 31), some nine months after the parties allegedly reached the "Interim Agreement" repeatedly referenced in CCC's complaint. Thus, CCC's claim has evolved from its original theory that Steelcase breached an interim agreement (in which Steelcase allegedly offered a retroactive refund based on CCC's future purchases) to the theory that Steelcase breached an agreement to pay a retroactive refund for furniture that CCC had already purchased in 1997.

11

With respect to the summary judgment motion, it is undisputed that the Offer Letter accurately reflected the incentives that Steelcase offered to CCC to select Steelcase for its next purchasing contract. (Def. SF ¶ 34.) Shortly after receipt of the Offer Letter, CCC verbally indicated that it had selected Steelcase to be its furniture provider. (*Id.* ¶ 50.)

### A.    Count I—Breach

#### 1.    Condition Precedent in the Retroactive Pricing Provision

The parties' most contested issue is whether payment of the $1.5 million refund was contingent on CCC's execution of a new contract. The parties vigorously dispute the definition of "execute." As indicated above, the relevant portion of the Offer Letter is under the heading "Retroactive Pricing" (the "Retroactive Pricing Provision") and bears repeating: "This retroactive price adjustment of $1,500,000.00 will be in the form of a one-time refund to be paid *upon execution* of the [CCC]/OCI/[Steelcase] agreement naming Steelcase and [OCI] as sole source provider." (Def. Ex. BB at 00013-14) (emphasis added).

The gist of Steelcase's argument is that the Retroactive Pricing Provision unambiguously established that any refund obligation was "contingent upon execution of a definitive agreement, [and] absent such execution Illinois courts hold as a matter of law that the parties are under no obligation." (Def. Mem. at 5 (citation omitted).) Thus, according to Steelcase, payment of the $1.5 million refund was subject to the condition precedent that the parties execute a formal agreement. As the parties undisputedly failed to sign a finalized agreement, Steelcase maintains that, as a matter of law, it was not obligated to pay the refund to CCC. (Def. Mem. at 13.)

CCC offers a two-part response to Steelcase's condition precedent argument. First, CCC claims that "[t]here is a dispute regarding whether the parties intended . . . that Steelcase's

payment of the $1.5 million retroactive rebate was expressly contingent upon CCC's signature upon a written contract." (Pl. Mem. at 5.) Thus, CCC argues, whether the parties intended to create a condition precedent is a question of intent as to which "summary judgment is inappropriate." (*Id.* at 4-5.)

CCC's second response is somewhat less definitive. On one hand, CCC apparently asserts that there was no condition precedent at all because Steelcase has not satisfied its burden of showing the existence of a condition precedent. (Pl. Mem. at 5-6 (citing cases).) On the other hand, CCC maintains that to the extent "execution" of an agreement was a condition precedent to payment of the $1.5 million refund, the parties satisfied the condition simply by "doing business under their agreement." (*Id.* at 6-7.) In other words, CCC proposes, a signed agreement was not required; the parties needed only to conduct business in the wake of Steelcase's Offer Letter. Both of CCC's arguments rely heavily on assertions regarding the subjective intent, motive, and beliefs of CCC and Steelcase employees. (*Id.* at 5-8 (citing, *inter alia*, the deposition testimony of CCC employees regarding their understanding of "execution").)

Under Illinois law,[4] "a condition precedent is one which must be performed before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform." *McKee v. First Nat'l Bank of Brighton*, 581 N.E.2d 340, 345 (Ill. App. 1991). If the condition precedent is unsatisfied, "the obligations of the parties are at an end." *Id.* at 345. The existence of a condition precedent is determined by whether the parties intended to create the condition at the time of contract formation. *See Meyer*

---

[4] This case was originally filed in Illinois state court, and both parties relied on Illinois law in their briefs. As there does not appear to be any independent justification for applying another forum's law, the Court will follow suit and apply Illinois law in resolving this motion.

*v. Marilyn Miglin, Inc.*, 652 N.E.2d 1233, 1239 (Ill. App. 1995). Of additional relevance here, Illinois courts have long recognized that parties may condition their contractual obligations on later execution of a formal contract. *See, e.g., Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.*, 500 N.E.2d 1, 5 (Ill. 1986) ("[E]ven where the essential terms [of an oral agreement] have been agreed upon, if the clear intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into existence until such execution and delivery.") (collecting authority).

The determination of the parties' intent regarding a condition precedent is a question of law where the relevant language at issue is unambiguous. *See, e.g., Catholic Charities v. Thorpe*, 741 N.E.2d 651, 653 (Ill. App. 2000). Language that is unambiguous is language susceptible to only one reasonable interpretation. *See Moriarty v. Svec*, 164 F.3d 323, 330 (7th Cir. 1998). Ambiguous language, on the other hand, is susceptible to more than one meaning or is otherwise obscure. *See Meyer*, 652 N.E.2d at 1238. Conditions precedent may be indicated by terms such as "'on the condition,' 'subject to,' 'when,' 'as soon as,' or other similar terms." *AAR Int'l, Inc. v. Vacances Heliades, S.A.*, 202 F. Supp. 2d 788, 800 (N.D. Ill. 2002); *accord, e.g., Ocean Atl. Dev. Corp. v. Aurora Christian Sch., Inc.*, 322 F.3d 983, 999 (7th Cir. 2002) (collecting cases).

With respect to whether the Retroactive Pricing Provision contains a condition precedent, Steelcase's position is on the mark. The relevant language is "to be paid *upon execution* of . . . the agreement," and Court does not find the language ambiguous or obscure. The phrase "upon execution" in its use and context clearly indicates that the parties envisioned that payment of the $1.5 million refund would follow execution of a future agreement between the parties. CCC's strained arguments, which center on the parties' subjective intent (*see* D.E. 16 at 4-6 (principally

relying on Pl. SAF ¶¶ 4-7)[5]), belie the express language in the Retroactive Pricing Provision and run afoul of longstanding maxims of contract interpretation. *See, e.g., Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989) ("[I]f intent were wholly subjective there would be no parol evidence rule, no contract case could be decided without a jury trial, and no one could know the effect of a commercial transaction until years after the documents were inked. . . . '[I]ntent' in contract law is objective rather than subjective. . . ."). Thus, the Court concludes that the phrase "upon execution of the [CCC]/OCI/[Steelcase] agreement naming Steelcase and [OCI] as sole source provider" unambiguously signals the parties' intent to create a condition precedent.[6]

---

[5] Plaintiff's SAF ¶¶ 4-7 rely almost exclusively on the deposition testimony of two CCC employees (Mr. Redig and Ms. Reid-Neal) concerning the contract negotiations and their subjective interpretations and understandings of the terms of the Offer Letter. As explained further below, Illinois contract law looks with particular disfavor on the use of subjective evidence—such as an interested party's testimony—to contradict the otherwise clear written terms of a contractual document. *See, e.g., Ocean Atl. Dev. Corp.*, 322 F.3d at 1003-04 (collecting cases).

[6] Plaintiff cites *Barton Chemical Corp. v. Pennwalt Corp.* 399 N.E.2d 288, 291 (Ill. App. 1979), for a number of general propositions concerning conditions precedent, but *Barton Chemical* does not counsel against a finding here that the parties' agreement contained a condition precedent. For example, while it is certainly true, as Plaintiff suggests, that the issue of whether the parties have created a condition precedent is "'a question of intent,'" (Pl. Mem. at 5 (quoting *Barton Chemical*)), *all* contractual interpretation questions are essentially questions of intent, and it is well-settled in Illinois law that the task of trying to ascertain such intent of the parties is centered on the written language of contractual documents when such language is, as here, clear. *See, e.g., Ocean Atl. Dev. Corp.*, 322 F.3d at 995-96 (discussing, *inter alia, Empro Mfg. Co.*, 870 F.2d at 434-35). And while "'the mere reference to the execution of a formal written contract'" (Pl. Mem. at 5 (quoting *Barton Chemical*)) does not necessarily and always dictate the conclusion that the parties had not already reached an enforceable bargain, that truism does not mean that where, as here, the parties have clearly evinced their intention that an obligation will not accrue until a written contract is executed, that the parties' agreement should be disregarded. *See, e.g., Ocean Atl. Dev. Corp.*, 322 F.3d at 996-97 (collecting cases). In this regard, it bears mention that the parties made clear that their agreement (which we can assume was reached) included the term that any obligation to pay $1.5 million would not (perhaps unlike

15

2. "Execution" of an Agreement Requires Signing

CCC also contends, however, that "execution" of an agreement in the Retroactive Pricing Provision does not mean *signing* a written contract. CCC's principal argument on this score is that Kurt Redig and Debbie Reid-Neal—the CCC employees who were present at the January 1998 meeting in which Steelcase presented the terms contained in the Offer Letter—did not understand "upon execution" to mean the signing of a written contract. (Pl. Mem. at 5-6.) For example, CCC repeatedly offers deposition testimony of these two CCC employees (Redig and Reid-Neal) proffering their belief that the refund "would be paid once the parties commenced doing business under their agreement." (Pl. Mem. at 6.) In its statement of facts, CCC also offers several dictionary definitions of "execute" in order to contend that "execution" of an agreement does not necessarily signal the requirement of a signature.[7] In essence, CCC maintains that "execution" as used in the Retroactive Pricing Provision is ambiguous and proposes admission of extrinsic evidence to determine its meaning.

Traditional rules of contract construction teach that a court's principal goal in interpreting a contract "is to ascertain and give effect to the parties' intent at the time they entered the

---

other obligations) become due unless and until Plaintiff executed a contract naming Defendant as Plaintiff's supplier. Thus, even if the parties reached an oral agreement that was reflected in the Offer Letter, that agreement included the provision that any rebate obligation was contingent on execution of a contract naming Defendant as Plaintiff's supplier. It also bears mention that in the written contract drafts that circulated for some two years, there were not provisions about payment of the $1.5 million rebate (*see* Def. SF ¶¶ 53, 81, Def. SF Ex. RR), so Plaintiff apparently cannot (and does not) claim that it is entitled to the rebate through performance in conformity with the written drafts.

[7] For instance, CCC cites *Meriam-Webster*'s definitions of "execute" as "to carry out fully, put completely into effect" and "to do what is provided or required by a decree." (Pl. SAF ¶ 8.) CCC also cites *American Heritage Dictionary*'s definitions of "execute" as "to carry out; put into effect" and "to perform." (Pl. SAF ¶ 9.)

contract." *Meyer*, 652 N.E.2d at 1237. If the relevant terms are not ambiguous, a court will look

exclusively to the language in the contractual document to determine the parties' intent as a

matter of law. *See id.* at 1238. As discussed earlier, language is ambiguous if it is obscure or

susceptible to more than one meaning; ambiguity does not arise simply because the parties

disagree as to the correct interpretation. *See id.*

Regarding any ambiguity of "execution" in the Retroactive Pricing Provision, the Court

must again disagree with CCC's proffered analysis. There is nothing facially ambiguous about

the meaning of "execution"—particularly "execution" of an agreement "naming" Defendant and

OCI as CCC's sole source provider. Illinois precedent supports Steelcase's proposition that the

word "execution" (and its various forms) in the context of contracts or other legal instruments

requires signature, if not more. *See, e.g., IK Corp. v. One Fin. Place P'ship*, 558 N.E.2d 161,

164-65 (Ill. App.1990) (holding, as a matter of law, that a clause stating that it would not become

effective "until executed" was not enforceable because contract had not been signed and

delivered); *Magnus v. Lutheran Gen'l Health Care Sys.*, 601 N.E.2d 907, 913-14 (Ill. App. 1992)

(holding that an agreement which was conditioned upon the execution of a formal agreement was

unenforceable because the latter "was never signed or delivered"); *accord Ocean Atl.*, 322 F.3d

at 997-98 (affirming summary judgment for defendant where "several key obligations and events

. . . were to be triggered by the execution of the anticipated contract," which foreclosed any

obligation "until a contract was signed").

CCC offers extrinsic evidence—including the deposition testimony of Redig and Reid-

Neal—to attempt to cast doubt on the meaning of "execution." The Court notes that there is

some disagreement under Illinois law regarding the admission of extrinsic evidence to show the

17

existence of an ambiguity in a contract's terms. *See AM Int'l, Inc. v. Graphic Mgmt. Assocs. Inc.*, 44 F.3d 572, 574 (7th Cir. 1995) (contrasting Illinois's "four corners" rule with the more flexible "provisional admission" approach). Nevertheless, even under the more generous Illinois authority allowing admission of extrinsic evidence, only *objective* extrinsic evidence qualifies—*subjective* evidence, such as testimony of an interested party as to what he or she subjectively believed a term to mean, is not allowed for this purpose. *See, e.g., id.* (noting that "[s]uch testimony is invariably self-serving, being made by a party to the lawsuit, and is inherently difficult to verify").

Thus, in *Mathews v. Sears Pension Plan*, 144 F.3d 461 (7th Cir. 1998), the Seventh Circuit explained that, "[i]n limited circumstances . . . parties are allowed to present extrinsic evidence to demonstrate that although the contract looks clear, anyone who understood the context of its creation would understand that it doesn't mean what is seems to mean. This is the doctrine of extrinsic ambiguity." *Id.* at 466 (collecting cases). However, the Seventh Circuit stressed that the doctrine contained important limitations, and that the "most fundamental of these limitations is that to be admissible to establish an ambiguity, extrinsic evidence must be objective; that is, it must not depend on the credibility of testimony (oral or written) of an interested party. . . ." *Id.* at 467 (collecting cases). In *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610 (7th Cir. 1998), the Seventh Circuit further instructed that the doctrine of extrinsic ambiguity "should be interpreted narrowly lest it swallow the rule . . . . Unless the evidence sought to be introduced not only is objective but would if believed make a compelling case that the contract means other than what it seems to mean, it should be kept out." *Id.* at 615; *accord, e.g., In re Sears Retiree Group Life Ins. Litig.*, 90 F. Supp. 2d 940, 949-50 (N.D. Ill. 2000)

(Moran, J.) (applying *PMC*).

With this teaching in mind, the Court examines the extrinsic evidence offered by Plaintiff in support of its contention that a triable issue exists concerning the meaning of the term "upon execution" of an agreement "naming" CCC's sole source furniture supplier. The lion's share of Plaintiff's proffered evidence runs afoul of the Seventh Circuit's teaching in cases such as *Mathews*. For example, Plaintiff repeatedly offers the deposition testimony of Plaintiff's employees who participated in the contract negotiations. (Pl. Mem. at 6-7 (repeatedly citing Pl. SAF ¶¶ 4-7).) This is precisely the sort of subjective and typically self-serving evidence that is not allowed. *See, e.g., Ocean Atl. Dev. Corp.*, 322 F.3d at 1004 (rejecting plaintiff's proposed proof, which "focus[ed] on the parties' own, subjective construction of the offers and whether or not they were binding"); *AM Int'l*, 44 F.3d at 574 (teaching that such "'subjective' evidence is inadmissible for this purpose").

The remainder of Plaintiff's cited evidence also does not create a triable issue under Seventh Circuit precedent. Plaintiff notes, for example, that CCC bought some $30 million of office furniture from Defendants during 1998 and 1999; as a result, Plaintiff asserts, Steelcase has already received the benefit of its agreement with CCC and it would be "manifestly unjust" to cause CCC to "forfeit the $1,500,000 retroactive rebate that CCC earned." (Pl. Mem. at 7.) None of this, though, is evidence concerning whether the parties previously objectively agreed that the rebate would become due if and when Plaintiff signed a five-year contract naming Defendant as its sole source supplier. Plaintiff may have ordered furniture from Defendants (albeit far less than Plaintiff specifically represented would be its projected purchases) for any number of reasons—including the possibility of favorable price terms that it had induced from

19

Steelcase after promising Steelcase that it would sign a contract soon. (Def. SF ¶¶ 54-56.) But none of those purchases changes the fact that the $1.5 million credit was to be earned upon signing of an agreement. Nor does CCC's proffered evidence change the fact that CCC does not dispute that such a signed agreement would have provided benefits to Steelcase that would have been real and that are not frivolous or facially pretextual in a way that might invite second-guessing by a court. (*See* Def. SF ¶¶ 72, 74 (reflecting fact that parties both recognized that benefits would have accrued to Defendant from a signed agreement[8]).)

CCC's proffered deposition testimony is plainly subjective and therefore inadmissible to create a material dispute regarding the meaning of "execution" in the Retroactive Pricing Provision. The Court finds no ambiguity regarding the parties' use of the term. If CCC's employees truly had a different understanding of the term—*i.e.*, other than its ordinary meaning as signing of a legal document, *see, e.g.*, *IK Corp.*, 558 N.E.2d at 164-65—they should have made certain that the terms of the Offer Letter (which by its terms summarized the negotiations of the parties' January 1998 meeting and Steelcase's subsequent offer) clearly reflected the alternative interpretation. *See generally Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814-15 (7th Cir. 1987) ("Secret hopes and wishes count for nothing. The status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves.") (applying Wisconsin law).

---

[8] The Court need not decide whether it would be legitimate to disregard a clear contractual precondition if the triggering event seemed to be of trivial importance to the judge at the time of the litigation. All the Court means to say is that while one might be skeptical of the *bona fides* of a litigant who insisted that a contractual obligation were not owing because a seemingly meaningless or frivolous precondition had not been fulfilled, there is obvious common sense value in having a signed commitment from another party as opposed to an oral agreement. (*Accord* Def. SF ¶¶ 72, 74.)

In so finding, the Court notes that it examined certain potential evidence Plaintiff identified generally in its summary judgment papers (*e.g.*, in the fact section of its brief) but that Plaintiff did not use to argue that there was sufficient evidence to create a triable issue concerning the meaning of the term "upon execution" in the Offer Letter. While the Court finds that the Plaintiff waived any argument based on this evidence, the Court further notes that it did not find any of this evidence to create a triable issue concerning the "upon execution" phrase based on appropriate objective extrinsic evidence. Thus, for example, while Plaintiff might have properly offered bits and pieces of evidence it identifies in support of its Plaintiffs' Statement of Facts ¶¶ 21-25, those snippets, even taken together, do not create any meaningful issue about whether the parties' understanding embodied in the Letter Offer was anything other than it appeared to be. The Court further notes that Defendant is correct when it contends that if objective extrinsic evidence is considered generally, that inquiry is on balance unfavorable to Plaintiff, not favorable. As Defendant explains, the most powerful commonsense piece of objective extrinsic evidence is that Plaintiff *never* requested that the $1.5 million be paid during the entire time that the parties were going back and forth about the terms of the written contract proposals. As Hal Ronin, Plaintiff's Group Vice President of Corporate Real Estate during the negotiations, acknowledged, $1.5 million was a significant amount of money to CCC. (Def. SF ¶ 58.) Likewise, Ronin acknowledged that CCC executives naturally were obliged to try to obtain available monies for CCC related to its corporate activities. When one tries to fairly and objectively evaluate whether the parties' apparent agreement (as reflected in writing) was, in fact, something other than it appears clearly to be, it is obviously telling that Plaintiff never acted in a manner consistent with any understanding that the $1.5 million obligation had in fact been due.

21

A reasonable jury would surely appreciate that no company would leave a seven-figure receivable hanging in the air, without ever even inquiring once with the supposed debtor about payment—for some *two years*—if the putative creditor actually believed the $1.5 million payment was due.

In sum, the Court finds that the Retroactive Pricing Provision contains a condition precedent making payment of the $1.5 million refund contingent on a signed agreement between CCC, Steelcase, and OCI naming Steelcase and OCI as sole source provider. It is undisputed that the parties did not sign a new contract, so the condition precedent was never satisfied.[9] The written language of the Offer Letter, when viewed against applicable Illinois and Seventh Circuit precedent directs this conclusion. A review of objective evidence offered by Plaintiff does not reasonably invite a different result; indeed, if one looks at the objective extrinsic evidence as a whole, it confirms that the textual meaning was the one actually understood by the parties.

### 3. There Is a Colorable Factual Issue Concerning Whether Defendant Waived the Condition Precedent

As the Court noted earlier, the parties have expended considerable energy debating the existence of a condition precedent in the Retroactive Pricing Provision. Although the Court concludes the provision contained a condition precedent that went unfulfilled, the Court's analysis does not end here. Plaintiff also contends that there is a triable issue concerning whether Steelcase waived the condition precedent. The Court agrees that there is a triable issue

---

[9] Defendant also highlights evidence casting doubt on the testimony of Plaintiff's representatives concerning their subjective understandings of the parties' agreement—including documentary evidence that appears to squarely conflict with the deposition testimony offered by Plaintiff's employees. The Court does not review such evidence at length because precedent teaches that such subjective evidence is not appropriately considered in this analytical context.

concerning waiver, such that summary judgment on the contract claim is improper.

Under Illinois law, waiver is either an express or implied voluntary and intentional relinquishment of a known and existing right. *See Whalen v. K-Mart Corp.*, 519 N.E.2d 991, 994 (Ill. App. 1988). As with other contract provisions, a party may waive strict compliance with conditions precedent in a contract. *See MBC, Inc. v. Space Ctr. Minn., Inc.*, 532 N.E.2d 255, 260 (Ill. App. 1988) (citation omitted). As Plaintiff contends, under Illinois law, "[a]ctions indicating that strict compliance with a particular provision will not be required may be evidence of such waiver." *Barker v. Leonard*, 635 N.E.2d 846, 848 (Ill. App. 1994) (citations omitted).

Here, there is sufficient evidence to create a triable issue of fact concerning waiver. While some of the evidence offered in support of waiver by Plaintiff does not seem relevant—largely because it was never seen by CCC, and thus seems an unlikely basis to have prompted any belief that waiver had occurred[10]—there is some evidence that could prompt a jury to find a waiver took place. For example, there is disputed evidence that Rae Radovich told a CCC employee on multiple occasions that "I know the contract's not signed but everybody's living up to the terms of the contract." (Pl. SAF ¶ 33.[11]) In addition, Defendant paid the so-called Nashville credit—which, as Defendant points out, was largely predicated on the

---

[10] For example, CCC identifies some vague and/or loose language in emails sent internally between Steelcase and OCI employees. (*See* Pl. SAF ¶ 23.) It is difficult to see how such language—even assuming it speaks with sufficient clarity to address waiver issues—could be relevant as there is no evidence that anyone at CCC was aware of the statements.

[11] Defendant objects to the statement as inadmissible hearsay because the alleged declarant was an employee of OCI. Although the Court need not resolve this issue definitively now, given the other potential evidence of waiver, the hearsay objection seems to be a weak one, or at least it is sufficiently weak that the evidence is not properly disregarded on the basis of the arguments in the summary judgment papers. *See* Fed. R. Evid. 801(d)(2).

fulfillment of a different condition precedent concerning purchase of various office workstations (Def. Resp. ¶ 12), but which was, at least in passing, also seen as linked to the execution of a written contract. To be sure, it is undisputed that Defendant continued to ask for performance of the condition precedent that a written contract be executed (Def. SF ¶ 71), and also undisputed that Defendant stated that CCC would not receive the $1.5 million rebate until a contract was signed (*id.* ¶ 72), but whether such statements were of sufficient clarity to dispel possible inferences of waiver from the other evidence cited, at least on the basis of the arguments as presented in the summary judgment papers, appears to be a question for a jury to decide. These disputed factual and inferential issues—along perhaps with the fact that the parties undeniably carried on some degree of business (albeit not as much as the parties might have anticipated) while they negotiated a written agreement over the course of nearly two years—are sufficient to create a triable issue as to whether Steelcase waived strict performance of a condition precedent that required signature of a written contract.

B.      Count II—Promissory Estoppel

In its summary judgment response brief, CCC did not respond to or otherwise address its promissory estoppel claim. Steelcase asks that the Court enter summary judgment in its favor because, it argues, CCC has abandoned the claim by failing to respond. (Def. Mem. at 15.) While it appears that courts sometimes regard as abandoned claims that the non-movant has not sought to preserve through appropriate argument and record citation, precedent appears to call for a different practice. In this regard, *Thornton v. Evans*, 692 F.2d 1064, 1074 (7th Cir. 1983), teaches that a court "may not automatically award summary judgment when the non-moving party stands on his pleadings." Instead, the moving party still must carry his burden of showing

the absence of genuine issues of material fact. *See id.* at 1075.

Nevertheless, the undisputed facts show that Steelcase is entitled to summary judgment on CCC's promissory estoppel claim. It is undisputed that Steelcase first offered the $1.5 million refund in January 1998 (Def. SF ¶ 31), and the refund was to apply to furniture CCC already purchased from May to December 1997 contingent on execution of a formal agreement. (*Id.*) As discussed earlier, CCC's promissory estoppel theory is based on the refuted allegations in its complaint that, subject to an "Interim Agreement," Steelcase offered the $1.5 million refund *before* CCC made its purchases in May to December 1997. (*See* Compl. ¶¶ 16, 18.) Although CCC offered facts and argument with respect to its modified breach claim (Count I), CCC offered no facts or argument in support of its promissory estoppel claim. On the undisputed facts before the Court, CCC's promissory estoppel claim, as pleaded (*see* Compl. ¶ 25), necessarily fails. Given that Plaintiff, a corporate entity ably represented by counsel, has no actionable promissory estoppel theory in its Complaint, and has not suggested a different actionable theory because it elected not to respond to Defendant's motion for summary judgment on the promissory estoppel claim, the Court considers any further theories waived.[12]

Accordingly, the Court grants Steelcase's motion for summary judgment on Count II.

---

[12] Given that Plaintiff is a corporate entity represented by counsel, it is not the Court's job to take sides and suggest theories that might have been advanced. The Court does note, however, that even if CCC had argued and provided factual support for a modified promissory estoppel claim based on the January 1998 Offer Letter, Count II would still be dismissed. Under Illinois law, "a party claiming promissory estoppel must also prove that it reasonably relied on the promise to its detriment." *In re Midway Airlines*, 180 B.R. 851, 945 (Bankr. N.D. Ill. 1995). Moreover, "[a] party cannot reasonably rely on an alleged promise when the transaction is subject to a condition precedent of the execution of definitive documentation." *Id.* (citing *IK Corp.*, 558 N.E.2d at 170.)

## IV.    **CONCLUSION**

For the foregoing reasons, the Court denies Steelcase's motion for summary judgment on

Count I and grants Steelcase's motion on Count II.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Date: _8 - 20 - 04_